558 A.2d 379

**UNITED WIRE, METAL & MACHINE HEALTH & WELFARE FUND et al.**

v.

**BOARD OF SAVINGS & LOAN ASSOCIATION COMMISSIONERS et al.**

No. 73, Sept. Term, 1988.

Court of Appeals of Maryland.

May 31, 1989.

Lawrence S. Greenwald (Nancy E. Paige, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Sidney L. Meyer, New York City, all on brief, for appellants.

Evelyn O. Cannon, Asst. Atty. Gen. (Mark D. McCurdy, Asst. Atty. Gen., Carmen M. Shepard, Asst. Attys. Gen., all on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

In this appeal we hold that the Circuit Court for Baltimore City did not abuse its discretion in approving the release by the receiver of Old Court Savings and Loan, Inc. (Old Court) of former officers and directors of Maryland Savings–Share Insurance Corporation (MSSIC) as part of the settlement of an action brought against those releasees by MSSIC's successor, a Maryland governmental corporation.

This appeal is another case arising out of the 1985 savings and loan crisis in Maryland. The development of the crisis is described in detail in W. Preston, *Report of the Special Counsel on the Savings & Loan Crisis* (1986). Aspects of the response by the State of Maryland to the crisis may be found in Md.Code (1980, 1986 Repl.Vol., 1988 Cum.Supp.), §§ 9–701 through –712 of the Financial Institutions Article (FI), relating to receiverships and conservatorships of state chartered savings and loan associations, and in FI §§ 10–101 through –121, relating to State of Maryland Deposit Insurance Fund Corporation (MDIF), a state agency in the Department of Licensing and Regulation. FI § 10–102. Aspects of the State's response to the crisis have also been described in *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988); *United Wire, Metal & Machine Health & Welfare Fund v. State Deposit Ins. Fund,* 307 Md. 148, 512 A.2d 1047 (1986) (*United Wire I*); and *Chevy Chase Savings & Loan v. State,* 306 Md. 384, 509 A.2d 670 (1986). Understanding the issue presented here requires briefly presenting some of these aspects.

In the spring of 1985 a number of savings and loan associations, including Old Court, failed. These failures in turn caused the failure of MSSIC, the private insurer of deposits in state chartered savings and loans. The State created MDIF and merged MSSIC into MDIF. *See* Acts of the First Special Session of 1985, Ch. 6, § 4 (uncodified). The statutory merger expressly included the transfer to MDIF of all of the assets and all of the liabilities, including insurance liabilities, of MSSIC. *Id.* MDIF is also the

receiver for Old Court and is receiver for other insolvent associations.

The Director of MDIF administers a special, nonlapsing fund (the Insurance Fund), one of the purposes of which is "[r]eimbursing savings account holders for loss incurred upon liquidation of a member association, up to the amount of insurance on any savings account[.]" FI § 10–110(a)(2)(iii). Old Court and other associations in receivership at which accounts were previously insured by MSSIC are "member association[s]" for purposes of the Insurance Fund. *See* Acts of the First Special Session of 1985, Ch. 6, § 5 (uncodified). Underlying the case presently before us is a controversy over the amount of insurance reimbursement to be made where large amounts are on deposit to the credit of one depositor. The amount of MDIF insurable loss is determined "[u]pon final liquidation of a member association," at which time MDIF's Director is to "[m]ake provision for the payment or assumption of any insurable loss to each depositor less any payments made" in advance of final liquidation. FI § 10–110.1(a). Advance payment of MDIF's insurance liability is authorized by FI § 10–110.1(c).[1]

---

1. FI § 10–110.1(c) provides:
    *"Cash payments or issuance of obligations.*—Subject to any other conditions established under law, if the Fund Director is reasonably satisfied that an insurable loss will be incurred upon final liquidation, in order to facilitate the payment of deposit insurance to depositors of a member association and to reasonably reduce the administrative costs of a liquidation, including demands on any hardship withdrawal plan, the Fund may, either upon final liquidation or earlier, and either from available moneys in the Fund or from any other State funds advanced to the Fund for that purpose:
        (1) Make a cash payment or payments or issue an obligation under a contract with one or more insured institutions with respect to the making available of insured accounts in an amount equal to all or any portion of the depositors' savings accounts to any or all of the depositors of a member association in receivership;
        (2) Make a cash payment or payments, in an amount equal to all or any portion of the depositors' savings accounts, to any or all of the depositors of a member association in receivership; or
        (3) Both."

In order to fund some partial distribution to depositors prior to the complete liquidation of insolvent associations' assets, and prior to the precise determination of the insurable loss, public moneys have been transferred to MDIF with which to make advance payments on its insurance liability. *See United Wire I,* 307 Md. at 152, 512 A.2d at 1049; Department of Fiscal Services, *Analysis of State Liability for Savings and Loan Obligation* (1st ed. Jan. 22, 1986); *Administration's Savings and Loan Financing Plan* (Jan. 10, 1986). This use of public moneys conforms with the policy declared by the General Assembly "that funds will be appropriated to [MDIF] to the extent necessary to protect holders of savings accounts in membership associations, and to enable [MDIF] to meet its obligations under a hardship withdrawal plan or partial distribution of assets." FI § 10–116.

A *quid pro quo* for the use of public moneys is the priority in favor of the State established by FI § 10–120(b)(3) which in part provides:

"[I]n any action of [MDIF] as insurer, subrogee, conservator, or receiver against a shareholder, director, officer, employee, agent, or other person contributing to a loss at a member association....

. . . .

"(3) All moneys recovered by [MDIF] as insurer or subrogee shall be first applied to repay any monetary advance by the State to [MDIF].... Moneys so recovered shall be placed in a separate account and transferred to the General Fund of the State."

In the Old Court receivership, the circuit court authorized at least one distribution plan, that which was before us in *United Wire I,* 307 Md. at 152–53, 512 A.2d at 1049. That partial distribution utilized " 'advance insurance payments of approximately $100 million[.]' " *Id.* at 152, 512 A.2d at 1049.

The State has also been endeavoring to liquidate former MSSIC assets and the assets of insolvent associations. One

of the assets is a claim against MSSIC's former officers and directors acquired by MDIF in the MSSIC merger. That litigation, one aspect of which was appealed to this Court in *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988), was ultimately settled for a $16 million payment to MDIF, in its capacity as insurer, and for an exchange of releases, including releases by MDIF in its various receiver capacities, including that as receiver of Old Court. The mutual release requirement of the *Hogg* settlement agreement in part provided:

"MDIF in its capacity as receiver or conservator of any MSSIC-insured savings and loan institution shall promptly take all steps to obtain court approvals necessary to the effectiveness of the provisions of this Agreement and to the release of MDIF's claims in such capacities, as provided in the Mutual Releases. In the event any such court declines to approve this agreement and/or the Mutual Releases on the terms and conditions contained herein, this Agreement is null and void."

The appellants herein, United Wire, Metal & Machine Health & Welfare Fund and United Wire, Metal & Machine Pension Fund (collectively, United Wire), are holders of savings accounts in Old Court. MDIF's position is that some $6.5 million of United Wire's deposits in Old Court are uninsured, a position which is the subject of other litigation. In the instant matter appellants pursue a complementary strategy, that of attempting to increase the amounts realized on assets of Old Court. When MDIF, as receiver for Old Court, applied for circuit court approval of Old Court's furnishing the release which the *Hogg* settlement agreement contemplated, United Wire opposed approval. Appellants contended that the claim against the *Hogg* defendants was properly that of Old Court, and not of MDIF as insurer. If the recovery from the *Hogg* defendants is considered as an Old Court asset, appellants submitted that the recovery should be included in a *pro rata* distribution to Old Court depositors based on the total amount of their respective claims, determined by both insured and any uninsured por-

tions of a given depositor's account or accounts. On the other hand, treating the *Hogg* recovery as an asset of MDIF, as insurer, means the settlement funds will be applied against MDIF's insurance liability. That application excludes United Wire's deposits from participation in the *Hogg* recovery to the extent, if any, that those deposits are uninsured.

The circuit court approved participation by the Old Court receiver in the *Hogg* settlement, and United Wire filed an order of appeal to the Court of Special Appeals. That order was clerically processed as an appeal to the Court of Special Appeals and this Court, on its own motion, issued the writ of certiorari to the intermediate appellate court before its consideration of the merits.[2]

United Wire argues that the *Hogg* settlement cannot be in the best interest of the Old Court receivership because the receivership gave up its claim but received nothing in return. Appellants submit that, if they are correct that Old Court had a claim against the former officers and directors of MSSIC, then it inexorably follows that the settlement, under which the $16 million recovery is paid into the Insur-

---

2. MDIF now submits that FI § 9–712(d)(2) operated in this case. That statute confers on this Court "exclusive and plenary jurisdiction over an appeal of any order of a State court approving a transaction under subsection (b) or (c) of" § 9–712. MDIF's position is that the order appealed from falls within FI § 9–712(b)(1), reading:

> "Upon application of the ... receiver, if the court ... determines that the consideration to be received from a transaction is fair and reasonable, the circuit court ... may approve any transfer, sale, or pledge of any or all of the assets of the ... receivership estate."

We need not decide whether FI § 9–712(b)(1) applies here or whether our jurisdiction is based on direct appeal or on certiorari. The parties are in agreement that the appropriate standard was applied by the receivership court, namely, whether the *Hogg* settlement was in the best interest of the receivership estate. *See Safe Deposit & Trust Co. v. Woodbridge*, 184 Md. 560, 570, 42 A.2d 231, 235 (1945). MDIF sees the "best interest" standard as requiring a determination that the consideration was fair and reasonable because of FI § 9–712(b)(1). If there is any substantial difference between the two articulations of the standard, it is not controlling in this case. Both articulations recognize broad judicial discretion in the receivership court which was not abused in the case before us.

ance Fund or to the General Fund of the State, cannot be in the best interest of the Old Court receivership. We need not, however, determine the validity of appellants' premise because we do not agree that the only conclusion flowing from their premise is that the settlement must be disapproved. Evaluation of the proposed settlement required weighing many factors. Some of the principal ones we now review.

*State v. Hogg,* 311 Md. at 452–53, 535 A.2d at 926, identified the claim asserted there as one by MDIF in its capacity as insurer.

"The theory of the suit, which sounds in negligence and in breach of fiduciary duties, is that the defendants violated duties owed to MSSIC and that MSSIC's rights arising out of those violations were acquired by MDIF in the merger.... It alleges that the defendants failed to utilize their power and positions to correct unsafe and unsound practices of member associations. Subdivisions of that pleading present more particular allegations concerning First Progressive and Old Court, Merritt Commercial, First Maryland, and Community savings and loan associations."

The complaint in *Hogg* was filed August 1, 1986. Essentially appellants complain now, by opposing approval of the settlement, that the *Hogg* suit was brought by the wrong plaintiff, *i.e.,* MSSIC's successor as opposed to Old Court's receiver, and on the wrong theory. The amended complaint claimed against twenty-six defendants and its forty-seven pages identified in specific associations specific transactions by specific fiduciaries which caused losses to MSSIC, losses which the *Hogg* defendants allegedly should have prevented or reduced. We may fairly assume that the issues generated by those allegations were the subject of discovery appropriate to a case which eventually settled for $16 million. There was also an appeal to this Court. The settlement agreement for the *Hogg* litigation is dated March 10, 1988. After that settlement was reached the appellants contended that MDIF had been riding the wrong horse down the

wrong road for some nineteen months. Thus, the factor of laches, if not estoppel, operates against appellants and in favor of approving the settlement.

United Wire argues that MDIF, as receiver, had substantially the same causes of action against the *Hogg* defendants as did MDIF, as insurer. Appellants cite no legal authority for that proposition. Instead, they select from MDIF's complaint in the *Hogg* case portions of the allegations, *e.g.,* "[d]efendants breached their duty to act in good faith, to exercise their power and authority in the best interest of MSSIC and to protect the savings of those who relied on MSSIC for the safekeeping of their deposits." The quoted allegation, and other portions of the complaint in *Hogg* pointed to by appellants, essentially describe, with some embellishment in the prose, the loss against which MSSIC insured and, consequently, the loss to MSSIC. Those allegations do not convert the claim asserted into a claim of the receiver for Old Court, and the recovery is not an asset of Old Court.

If, as United Wire asserts, the officers and directors of MSSIC breached a duty owed to Old Court, and that breach gave rise to a cause of action in Old Court which appellants believed should have been asserted by the receiver, then the correct procedure would have been for the appellants to make demand on the receiver to assert the claim. Were MDIF then to refuse to assert the claim as receiver, the appellants could have petitioned the receivership court to instruct MDIF to assert the claim as receiver. *See Pritchard v. Myers,* 174 Md. 66, 78–79, 197 A. 620, 626 (1938). There is no indication in the record extract that appellants utilized that procedure. Instead, they now ask the receivership court to disapprove the settlement as made.

On the other hand, the allegations from the *Hogg* complaint on which appellants rely speak of the *Hogg* defendants' duty to protect depositors in associations. If we assume, *arguendo,* that the alleged duty is legally recognized and ran directly to depositors in MSSIC member associations, appellants presumably could have asserted

their cause of action themselves, but did not do so. If the assumed cause of action is that of the depositors but is assertable by the receiver as their representative, then we see no reason why the requirements of a demand on the receiver and petition to the receivership court should not apply. *See Pritchard,* 174 Md. at 78–79, 197 A. at 626.

In any event, the issue before us is not whether, at the time the *Hogg* complaint was filed, MDIF, suing as receiver for Old Court, could have structured allegations involving Old Court transactions which would have survived a motion to dismiss by officers and directors of MSSIC. The issue now is whether the receivership court should have refused to approve one of the conditions of the settlement, Old Court's release of the *Hogg* defendants, because MDIF did not structure the complaint with Old Court's receiver as plaintiff. As actually structured, the *Hogg* complaint relied upon well recognized duties, those of loyalty and to use best efforts, which are owed by officers and directors to their corporations. *See* Md.Code (1975, 1985 Repl.Vol.), § 2–405.1(a) of the Corporations and Associations Article; *Maryland Metals v. Metzner,* 282 Md. 31, 382 A.2d 564 (1978); *Chesapeake Constr. Corp. v. Rodman,* 256 Md. 531, 261 A.2d 156 (1970); *Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 74 A.2d 17 (1950); *Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598 (1875). On the other hand, the legal theory on which appellants would have had the receiver rely is not one which they supported by reference to any provision of the MSSIC bylaws, of any statute, or by any case law. Indeed, in the somewhat related area of claims by officers and directors of insolvent depositories against federally chartered insurers of accounts, it has been held that the insurer had no tort duty to prevent loss in the insured depository. *See, e.g., First State Bank v. United States,* 599 F.2d 558 (3d Cir.1979) (the FDIC had no duty to warn bank officers and directors about wrongdoing committed by bank officer and discovered by FDIC), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980); *Federal Deposit Ins. Corp. v. Renda,* 692 F.Supp. 128 (D.Kan.1988)

(regulatory duties of FDIC and FSLIC do not give rise to a duty to discover and report possible fraud or wrongdoing to a bank or its officers and directors); *Federal Deposit Ins. Corp. v. Butcher,* 660 F.Supp. 1274 (E.D.Tenn.1987) (FDIC has no duty to discover or report fraud or threat of insolvency to a bank as such duty rests squarely on bank officers and directors); *Federal Savings & Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184 (D.Md.1984) (in dismissing counterclaims of directors, employees and officers of federally chartered savings and loans against FSLIC, the court held that FSLIC had no actionable duty to regulated institutions); *First Savings & Loan Ins. Corp. v. Alexander,* 590 F.Supp. 834 (D.Haw.1984) (the FSLIC has no duty arising from regulation which extends to directors of a savings and loan), *modified on other grounds,* 795 F.2d 1450 (9th Cir.1986).

United Wire submits that MDIF was required to sue the MSSIC officers and directors in its capacity as Old Court receiver in order to avoid the conflict in the receivership between claims by depositors whose accounts are fully insured and claims by depositors whose accounts are not fully insured. United Wire's solution to that conflict creates other conflicts. At oral argument in this Court, United Wire acknowledged that MDIF could not have sued the MSSIC officers and directors solely on behalf of Old Court but that the other insolvent associations whose transactions were the basis of allegations in the *Hogg* complaint would additionally have to have been joined as plaintiffs through their receivers. In a hypothetical action on the United Wire model, this creates conflicts between receiverships in the apportionment of the recovery. Seemingly any approach to apportionment, whether by a mathematical calculation utilizing estimated or final asset/liability deficits in each receivership or by attempting to assign settlement values to the losses claimed on particular transactions, would be open to criticism on grounds of unfairness to one or more associations.

Furthermore, had MDIF turned its back on the well recognized legal theory actually asserted and undertaken to sue on the more uncertain theory of the case advocated by United Wire, MDIF would have failed in its responsibilities as a State agency to the taxpaying public. The citizens of Maryland, through their elected representatives, have assumed an obligation to reimburse depositors up to the amount of insurable loss. By suing on less than the best available theory of recovery MDIF would shift to the taxpayers the risks that the theory utilized would produce a lesser recovery, or none at all, and thereby increase the amount required to fulfill the reimbursement obligation. It would be particularly irresponsible to increase the taxpayers' risk solely for the purpose of having the uninsured portion of some depositors' accounts share in the recovery when the public has undertaken to guarantee only the insured portion of depositors' accounts.

Nor is there any violation of the general rule of equity receiverships under which claimants of the same class are paid *pro rata* based upon the amount of their allowed claims. In this connection we shall assume that the claim which should have been asserted against the MSSIC officers and directors was a tort claim of Old Court or of its depositors and that the entire $16 million recovery should be allocated to the Old Court receivership. As we have seen, $100 million was advanced from the Insurance Fund to Old Court for a partial distribution. Depositors who were not fully insured were included in that distribution up to a maximum of $5,000 per aggregate account. *See United Wire I*, 307 Md. at 153, 512 A.2d at 1049. To the extent of that $100 million advance, MDIF, as insurer, is subrogated to the claims of Old Court or of its depositors "against a … person contributing to a loss at [that] member association…." FI § 10–120(b). Pursuant to FI § 10–120(b)(3) "[a]ll moneys recovered by [MDIF] as insurer *or subrogee* shall be first applied to repay any monetary advance by the State to [MDIF]…." (Emphasis added). Consequently,

even under United Wire's theory, none of the *Hogg* recovery would increase Old Court receivership assets.

Finally, a refusal by the receivership court to authorize the release by Old Court would have produced a failure of one of the conditions of the settlement agreement and jeopardized the $16 million settlement.

For all of these reasons the circuit court did not abuse its discretion in approving the *Hogg* settlement and entering the order appealed from. *See Lange v. Ghingher,* 168 Md. 353, 178 A. 116 (1935).

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.